at all. Oral argument, 15 minutes per side. Ms. Neff for the appellate. Good afternoon. May it please the court. The district court committed the following clear errors of law. First, it erred when it held, when it improperly weighed evidence and drew inferences in favor of UC to dismiss Dr. Zandvakili's claims of discrimination and retaliation. Second, it erred when it held as a matter of law that a comparator must have the same supervisor to meet the prima facie case requirements. Finally, it erred in concluding a nominal pay increase that still left Dr. Zandvakili as the lowest paid full professor in his department did not constitute an adverse employment action. With respect to the failure to promote claims, for both his discrimination and retaliation claims, the district court weighed the evidence drawing all inferences in UC's favor, violating the fundamental principles of the summary judgment standard. Dr. Zandvakili has presented sufficient evidence to rebut UC's assertions in hiring Chuck Socks for the associate dean position. Dean Lewis testified that Socks was, quote, more qualified, which has been contradicted by the record. Chuck Socks did not have any leadership or service commitments to UC during his tenure there. The advisory committee notes criticized Socks for being newer to the university and having lower energy. Lewis's more experienced claim is overblown when considering Dr. Zandvakili's record spanning three decades of leadership within the UC community and the local business community compared to Chuck Socks's, which was only three years. Interview panelists for this role, Elaine Hollansby, testified that the role was a community relations role and that the job posting specifically called out creating visibility and revenue associated with non-degree offerings in the local business community. This was clearly in line with Dr. Zandvakili's record. Further, department head of economics, Debasis Paul testified that Dr. Zandvakili had, quote, so much experience that he would have done a great job in the role. At a minimum, a reasonable jury could conclude that Dr. Zandvakili was as qualified or better qualified than Dr. Socks. Furthermore, UC's admittedly post hoc justification submitted in its summary judgment briefing that Dr. Zandvakili's, quote, low productivity somehow supported his rejection for the position. Does low productivity mean publishing? No, your honor, the low productivity they related to his alleged service to the college. I mean, doesn't the record show that he had not published a great deal in recent years he had earlier? Absolutely, your honor. The record did show that he had not published in recent years. However, the testimony of Elaine Hollansby was that research was not important for this associate director role. Excuse me, associate dean role. There was an associate dean role where research was important. This particular position was not. About leadership and Socks had more leadership? Is this the thought that he had more leadership in other institutions? Yes, your honor. The allegation by UC is that Chuck Socks had more leadership experience. However, their leadership experience was the same. They both held the position of department head. Dr. Zandvakili's position was at UC. Chuck Socks' position was at Alabama. That position that Chuck Socks held was a few years before he was applying for this particular position because he did not hold any leadership positions at the University of Cincinnati. Sorry. Not only is this post hoc justification which was not raised by Dean Lewis or the other two members of the search committee at the time of their depositions. Not only casts doubt on the legitimacy of defendants' assertions, but is also disputed by the record. Debauchess Paul also testified that Zandvakili's service to the Cincinnati community and academic community was quote substantial. Further, Dean Lewis based her support for hiring Socks on the interview of Chuck Socks. As this court has cautioned. This is a retaliation. This is your retaliation claim, right? Both for discrimination and retaliation, your honor. National origin discrimination. Yes, your honor. There's nothing in the record. It's not a direct evidence case. There's nothing in the record where someone said we don't want Iranians in leadership positions or something along those lines. Your client's Iranian, right? Yes, he is Iranian. There's nothing at all. It doesn't mean you can't prove your case. Sometimes these cases have evidence where people have made remarks that were insensitive or inappropriate or racist. Absolutely, your honor. However, in Levine versus DeJoy, which the Sixth Circuit wrote, it specifically indicated that that's not needed, right? That evidence is not needed. It's like very little. I mean, it sounds like your client's an excellent member of the faculty and is very qualified and there was someone else selected. Between the two, retaliation seemed a little closer, right? So your claim is that there was a complaint filed not long after. I know there's a bunch of different things that happened. I will talk about that. The last case was a little confusing, so I apologize. No, that's okay. The transition, but that there was close in time between filing the complaint and the decision or was that the raise? Yes, your honor. Actually, there's close proximity in time with both, right? So Dr. Zambichile made complaints to Dean Lewis in July and August and then reiterated some of those complaints in September of 2019. He was interviewed for the position of this associate dean role in December and the decision was made in December of 2019. So there is close proximity in time that also supports the retaliation claim in addition to the pretext evidence, which also includes there was some evidence in the interview panelist's notes that an interview panelist interviewed six particular candidates for three separate associate dean positions. The two candidates who were of not U.S. descent received the lowest scores. Further, the interview notes commented that Dr. Zambichile was, quote, not fit for the particular position. Those things are very subjective. So your client was selected to be interviewed, right? There's no title. I mean, he made it through some selection process to make it to the people who were interviewed. He just didn't make it over the final hurdle. I don't believe there's any evidence in the record about how many people applied for the position and how the selection to the interview. They didn't have to interview him. That was optional, right? Absolutely, they didn't have to interview him. The theory is they interviewed him and then discriminated against him after they selected him to be interviewed. Absolutely, that is the theory. Further, let me move on for a second, Your Honor. Just on the pretext point, I would like to point out that in its brief on Appellee's Brief, you see claims that the burden of establishing causation at the prima facie case is more onerous. However, in Dixon v. Gonzalez, this court instructed that the burden of proof at the prima facie stage is minimal. Numerous cases indicate that it is not onerous. It's not more onerous in the retaliation stage. The next error the district court committed related to its holding that Dr. Zambichile could not prove either of his Article 15 requests, which are the pay increase requests, claiming that Dr. David Brasington was not a comparator, imposing the same supervisor rule when this court has repeatedly held that the same supervisor criterion has never been read as an inflexible requirement. On Dr. Zambichile's 2018 Article 15 claim, if we were to accept UC's asserted narrow definition of supervisor, the pool of comparators would be zero, as questions of fact exist whether Dean Williams, in his limited tenure, actually considered any other Article 15 requests at that time. And Luzon v. Ford Motor Company, to do so would improperly render the... If we granted you this argument and said the provost is the ultimate decision maker, that gets you your prima facie case, then the response is, I forget now, is this the response, the budget had dried up and they didn't have money, or, I mean, the university had a response to it. I don't need to make their argument for them, but if we grant you this argument, the university has an explanation for what happened. Correct. There are actually inherent inconsistencies in the argument made by the university through the testimony of Dean Williams, who was the dean at the time. Williams claimed that his business manager, Deborah Myrie, instructed him that by granting an equity request for Dr. Zambichile, he would then have to turn around and grant requests for all members of the College of Business whose salaries were inequitable with other members. Myrie denies making that statement. Further, it's inconsistent with UC's own Article 15 policy. UC also relies on the budget. The plaintiff in this case has raised questions of fact with respect to that. For example, David Brasington received his $34,000 pay increase, which was the reason that the College of Business recognized that there was a budget crisis in the College of Business. His pay raise wasn't implemented until the following school year during this alleged budget crisis. Further, the testimony... When you say the business school, is that Williams the one who says there was a crisis? Dean Williams did say that there was a budget crisis and claimed that that was one of the reasons he denied Zambichile's... That's on the last one, in my view of the three. Okay, go ahead, I want to make sure I got it. Yeah, absolutely. Why do you say the financial crisis was alleged? Wasn't there testimony to the fact there was a crisis? There is testimony that there was a budget crisis. At the same time, during this alleged budget crisis, Dean Lewis, who replaced Williams, who was also working with an alleged budget crisis, there's testimony in the record that she approved pay increases during this period of time. She approved bringing in new hires during this particular... When did she replace Williams? She replaced Williams in the... It would have been the summer of 2020, I believe. Okay, much significantly later. 2019, sorry. It was 2019. Summer of 2019. Williams was only interim dean, I think, between May of 2018 and the summer of 2019. It's a Southern District of Ohio case, but in Brooks v. Dent, UC made a similar argument claiming that a budget shortfall justified the plaintiff's selection for termination. However, the district court rejected that as noting that UC had hired an employee to replace him at a substantially higher salary. Given UC's approval of Brasington's substantial salary increase, coupled with multiple other examples of new employees hired during this alleged budget crisis, a jury could reject UC's reliance on this budget crisis as a red herring to mask discrimination or retaliation. I see that I am out of time. Is it possible for me to get to the last claim? What is it? I don't know. I think we probably got the gist of it. Anyone have any questions? I think we've got a couple minutes for rebuttal, so if you need a little extra time there, we'll give it to you. Thank you, Your Honor.  Peterson? May it please the Court, Sam Peterson on behalf of the University of Cincinnati. Sam McKinley has acknowledged that he has no direct evidence of discrimination or retaliation. All six of his claims fail under the McDonnell-Douglas test for indirectly showing discrimination or retaliation as well. The university hired another individual for the associate dean position based on qualifications. It had the budget crisis for the one raise and lack of recent publications for both raises. There are additional reasons they fail, and our brief walks through all the reasons, both prima facie and pretextual. I'm happy to discuss any of those reasons, but I think the analysis that requires the fewest steps from this court is to resolve all the claims on the university's non-discriminatory reasons for its actions and Sam McKinley's failure to introduce any evidence showing that those reasons are pretextual. I'll begin where my colleague began with the associate dean position and the university's decision to hire Chuck Sox. Sam McKinley, in his deposition, you can see this at page ID 275 of his deposition, acknowledged that Dean Lewis, who is the ultimate decision maker, chose Sox because she believed him to be the most qualified individual for the role. That by itself should be dispositive of his claim. Under the honest belief rule, an employer's honest belief in its reasons, an employee cannot establish pretext even if those reasons are incorrect. So even if you were to accept all of the allegations about whether Chuck Sox did or did not have the qualifications that Lewis believed him to have, Sam McKinley has still conceded that argument. But the court shouldn't accept those because Sam McKinley articulates the wrong legal standard when you evaluate a failure to hire claim. This court in Bender and in Provenzano, upon which Sam McKinley relies, cites two different standards that apply. When you have probative evidence of discrimination, then it might be enough to show that you're as qualified or more qualified than the candidate that was hired. But when there is no probative evidence of discrimination, and Sam McKinley has introduced none, the standard is higher. You must show that you are the plainly superior candidate such that no reasonable employer would have chosen someone else. And that standard comes from Provenzano. Under Bender, evidence that a candidate was as qualified or marginally more qualified does not establish a genuine issue of material fact with respect to pretext. And so, for purpose of that, even if Sam McKinley had not conceded that Lewis hired the person that she thought was most qualified, he still cannot satisfy the relevant legal standard for hiring under the failure to hire claim. As for the two pay raise claims, there's an overlap here because you have, first, acting Dean Williams, who denied the claim for two reasons. He said, we've had a budget crisis, and even if we were not in a budget crisis, Sam McKinley's recent publications wouldn't entitle him to the $50,000 raise he sought. Now, in his brief, Sam McKinley argues the fact that the university has articulated two different reasons shows that this is somehow shifting justifications. But this court has been clear in 2020, for example, in Miles. It said that as long as you have additional non-discriminatory reasons that don't conflict with each other, then that doesn't constitute shifting justifications. The court reiterated that in a decision it published on Monday of this last week. And so, this has been the consistent principle throughout. And so, the fact that Williams offered two different reasons doesn't show shifting justifications. And Sam McKinley is also wrong about the nature of the budget crisis. He points to the fact that a different dean gave a different individual a raise in a year when the budget crisis would eventually be known. But at the time of that raise, it wasn't apparent that there was a crisis. And then Lewis, when she gave Sam McKinley a raise in 2019, at that point, the testimony was the budget crisis had improved. Plus, as Williams said, he was an acting dean. He didn't feel comfortable making the type of decision that a permanent dean would have the ability to do. He did not have that type of flexibility. But he went on to say, even if this wasn't a crisis, I would not have given this type of raise. Because Sam McKinley applied for the raise in 2018. And in the preceding decade, he had only published one journal article. He had published once in 2012. So he published in 2008. He published in 2012. And so, by the time he asked for a raise in 2018, he hadn't published for six years. That alone is a legitimate non-discriminatory reason for denying his request. The court, in admittedly an unpublished table case, Stein v. Kent State University, had said, difference in publications, in this case, between different qualities of journals, is enough to fail to make a prima facie case. It fails to show that you're similarly situated. And if you're not similarly situated, even saying, well, that is a low standard to make a prima facie case, it certainly doesn't show pretext or a lack of a non-discriminatory reason. And Dean Lewis made the same decision. When she confronted his request for a raise, she said, you have not been publishing. You are not entitled to a $50,000 raise. I have compared you to individuals both at the university and at peer institutions, and I've looked to see people with similar levels of publication. What is their salary? I've looked at your salary. Yes, it is lower than those individuals, but that's because you were not publishing and they were. But Lewis testified that she also wanted to find some support for Zanvakili, so she went on to say, but I've taken this additional step. I've looked to see how people who are at the university who are not publishing. There's no full tenured professor like you, but there's an associate professor who doesn't have tenure. But when you get promoted from associate professor to tenured professor, tenured full professor, then it usually comes with a pay bump. And she said usually that's about a 10% increase. And so I'm going to give you a $6,000 raise because that represents the pay bump to establish that gap between non-tenured and tenured professors. Now what about the other pay raise question where Williams drafts the letter favorable and then doesn't give it? What's the explanation there? In that case, the budget crisis sufficiently explains it. And I want to touch on the retaliation question about that because I know there had been... You can deal with it as you want, but I wanted to distinguish the two and hear something about that. Absolutely. So the raise that he was proposing is relatively similar to the $6,000 raise Zan Vickili ultimately got from Lewis. So Williams was facing a budget crisis. He was an acting dean. Lewis was a permanent dean. The budget crisis was improving. So that's one explanation. And as for the retaliation element, Zan Vickili says, well, I complained to a separate university official and two days later, Williams ultimately changed his mind. He changed his mind at some point, but he ultimately told me two days later after my complaint that I'm not getting a raise. He had actually drafted the letter about a month earlier, which is further back, but it's, as I understood it, Williams said he learned about the budget crisis much earlier. So the kind of question of why he drafted this letter is only a draft, but he says he was the one that did it a month earlier. And the reason he gave ultimately, because what he was attempting to do with that letter was doing what Dean Lewis ultimately did, was say there should be a gap in pay between tenured and non-tenured professors. But his testimony was that at that point he realized there are other people in a similar situation. And if he set a precedent, and I know this court is familiar with setting precedent, it has to be applied to everyone else in the  Is that the explanation that's at page 623? He's speaking in paragraphs. As a deposition, you usually shouldn't let a guy go on as long as he did. But he talks about early in my tenure as dean I made a decision, and it's not clear whether he's talking about the decision to write the letter or whether he's just talking about random past events. Is that the page that you're talking about? You know, Your Honor, I would love to be able to tell you specifically, but at this point your command of that part of the record is superior to mine. And so I can't point you directly to Williams' deposition, which page he said that. But what I will say is for the retaliation aspect, because I do want to make sure to touch on this, there's no evidence that Williams knew of the complaint that was made two days before he ultimately informed Zambichilli that he wouldn't be getting a raise. And so that's a key element of a prima facie case of retaliation. You have to show the university official knew about it, and there's absolutely no evidence. Olovson was a person who was in U of C, but a different department or agency? Yes. Yes. And so there's no evidence whatsoever that the complaint that was made to Olovson was ever communicated to Williams. There's also no evidence about when Williams ultimately drafted the letter, like you said, at least a month prior. At that point when he drafted the letter, he knew that Zambichilli had made some complaints about discrimination. And so that shows that at some point he was supportive of him despite those complaints. And so there's no clear evidence about when Williams changed his mind, and Zambichilli has not introduced any evidence that would suggest he changed his mind upon learning of a complaint of discrimination. One thing I also want to touch on with respect to Dean Lewis's pay raise decision, I know the district court ruled that there was no adverse employment action, and it cited some precedent from this court that would support that decision. Now I think that gets into some difficult line drawing problems, and the bright line standard that the district court applied probably is not correct, but that doesn't prevent this court from affirming. This court reviews judgments, not opinions, and Bender and Provenzano both point the way. In Bender the court said we can affirm on grounds other than the ones that were considered below, and in Provenzano you have a district court that misapplied the prima facie case, but this court affirmed on the basis there was non-discriminatory reason and no pretext. So even assuming that the district court erred on that point, it's not a basis for reversal, it's just a basis to affirm on separate grounds. I'm happy to continue to answer any questions. There's a lot going on in this case. As I said, I think the most straightforward is to resolve this on non-discriminatory reasons, because you can resolve both the discrimination and retaliation claims together that way. You don't have to walk through the prima facie standard for retaliation and for discrimination, which is a bit different because but for causation, retaliation is different than the contributory causation under discrimination. If the court has questions about any of those, the reasons, I'm happy to entertain them, but other than that I would yield the remaining amount of my time. Thank you very much. Thank you. I hear your rebuttal. Yes, Your Honor. As for the recent publications claim, I'd like to call the court's attention to Article 15, UC's own Article 15, does not require that merit only justify a pay increase. Further, Dean Williams himself received an equity increase in pay of over $20,000 when he had not published in a number of years. In fact, he hadn't published since 2009 in the pay increase he received was in 2016. UC's deviation from its own policies and from its own practice does cause or create pretext. Furthermore, as it relates to the 2019 equity increase, I will go to pretext. Dean Lewis's evaluation of Dr. Zambichilli's request was rife with subjectivity, which is a ready mechanism for discrimination and retaliation. She subjectively decided to exclude David Brasington, someone who's from his own department, claiming that it was an outlier, arbitrarily deflating internal salary numbers. She then subjectively applied this scholarly academic versus practice academic SA versus PA designation when admittedly she could not find external salary data using those designations. Debash's Powell's testimony also disputes that this SA versus PA designation should be used for anything other than assigning teaching loads. She arbitrarily compared Dr. Zambichilli to an associate professor, deviating from this new policy she created and from UC's policies. And then after 2020, her deposition testimony is that she did away with this Article 15 policy process altogether to focus on one that looked beyond publication record. It's important to note that after she made the $6,000 salary increase, which is approved by the provost, Dr. Zambichilli remained the lowest paid full professor in the department and he made less than David Brasington made before he got his $34,000 salary increase. Your client had the opportunity to leave, I think, to go to Illinois? He did. University of Illinois. Maybe it's not relevant, but that was a big pay raise that he turned down to stay. Yes, Your Honor. I believe at the time he did have young children when that came up. That pay raise would have been $180,000. I think it's further evidence that his salary, even with the pay increase of $6,000 being in the 140s, is still substantially low for the market. And given that David Brasington by this time was making $195,000, it's substantially low than the internal market. Even with a $50,000 pay increase, if he had actually received that from Dean Lewis, he still would have been making less than David Brasington. There was a reference by my colleague here to honest belief. I just wanted to point out that the honest belief doctrine applies to the first prong of the Manzer test, or first category of the Manzer pretext categories that it sets out. We are not alleging, we are not focusing on the first prong, so it is not relevant to this case. UC can't just hide behind this allegation that it was the business judgment to hire Sox over Zambichilli because it's still infected with discriminatory intent. We've pointed out disputed facts as it relates to the hiring decision. Thank you, Your Honors. Thank you very much. The case will be submitted.